IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNIE KNEPPER,

    *Plaintiff*,

    v.

VOLVO GROUP NORTH AMERICA,
*et al.*,

    *Defendants*.

Civil Action No. ELH-18-02879

**MEMORANDUM OPINION**

This case arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq., and primarily concerns a dispute regarding the calculation of retirement benefits. *See* ECF 12 ("Amended Complaint"). Plaintiff Ronnie Knepper accrued pension benefits over the course of his 22-year employment with Mack Trucks ("Mack") and its successor, Volvo Group North America ("VGNA" or "Volvo"). Various pension plans were in effect during Knepper's employment.

Knepper claims that defendants VGNA and The Volvo Group North America Retirement Plan ("VGNA Plan") have "failed to properly calculate" and pay the pension benefits to which he is entitled. He alleges that, following his retirement on August 1, 2013, VGNA "incorrectly" calculated his "benefits payment amounts and retirement date" and failed to provide him "with all options and timing of benefit payments." ECF 12, ¶ 79. According to plaintiff, defendants incorrectly used his earnings from 1987 to 1991 to calculate his benefits under a non-union contributory plan in which he participated before he transferred to a union position in 1991.

Under that plan (hereinafter sometimes called the "Contributory Plan"), Knepper receives a pension benefit of $148.53 per month. *Id.* ¶ 34. But, Knepper maintains that defendants should have calculated his pension benefit using his highest average wage from 2005 to 2009, after he

transferred to the union benefit plan. This would yield a monthly benefit of $294.29 under the Contributory Plan. *Id.* ¶ 36. In the alternative, plaintiff seeks "equitable estoppel and reformation of the Plans to conform to the Defendants' historical practice" with respect to "similarly situated participants." *Id.* at 13 (Prayer for Relief).

Plaintiff also complains that defendants failed to pay him any benefits under any plan for the first 34 months following his retirement. *Id.* ¶¶ 62–67. In addition to recovery of those benefits, plaintiff seeks attorneys' fees and costs. *Id.* at 13.

Based on these allegations, the Amended Complaint contains three counts: "Denial of Benefits and Rights" under § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (Count I); "Breach of Fiduciary Duty" under § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Count II); and Violation of § 502(c), 29 U.S.C. § 1132(c) (Count III). *Id.* ¶¶ 76–96. Two exhibits are appended to the suit.

Defendants have moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 14. The motion is supported by a memorandum of law (ECF 14-2) (collectively, the "Motion") and six exhibits (ECF 14-4–14-9). Knepper opposes the Motion. ECF 17 ("Opposition"). He argues that the "Motion is an improper attempt to have the Court make a benefit determination without the benefit of the full administrative record." *Id.* at 1. Defendants have replied. ECF 18.

No hearing is necessary to resolve the Motion. See Local Rule 105.6. For the reasons that follow, I will grant the Motion in part and deny it in part.

# I.    Factual Background[1]

Knepper, who is "over the age of sixty-five" (ECF 12, ¶ 8), began working for Mack in 1972 and retired from VGNA on August 1, 2013.  Knepper was an employee in the engineering department.  ECF 12-3, ¶3.  During that time, he accrued pension benefits under various pension plans: Mack's optional Contributory Pension Plan, a part of the Mack Non-Bargaining Unit Employees Plan ("NBE Plan"); the Mack/United Auto Workers ("UAW") Pension Plan ("UAW Plan"); and the Volvo Group North America Retirement Plan, also called the "Cash Balance Plan" (collectively, the "Plans").  ECF 12, ¶¶ 12, 13, 16, 20, 22.  The calculation of benefits issue concerns the Contributory Plan, which is part of the NBE Plan, and the UAW Plan.

When Knepper began his employment with Mack in 1972, he was a "non-union employee." *Id.* ¶ 9.  From 1972 until approximately June 1991, he "worked in positions that were not in a collective bargaining unit."  *Id.* ¶ 11.  From November 1, 1986 through June 9, 1991, Knepper "participated in the optional" Contributory Plan, which was part of the NBE Plan.  *Id.* ¶¶ 12, 13.  He "contributed to the Mack Contributory Plan through payroll deductions."  *Id.* ¶ 14.  Both the "Contributory Plan" and the "Non-Contributory Plan," referred to in the Amended Complaint, appear to be part of the NBE Plan.

In 1991, Knepper's "job at Mack was converted into a bargaining unit position covered by a collective bargaining agreement" between Mack and the UAW.  *Id.* ¶ 15.  Therefore, after June 9, 1991, he "became an inactive participant" in the NBE Plan.  *Id.* ¶ 18.  Instead, Knepper "became a participant" in the UAW Plan.  *Id.* ¶ 16.

---

[1] As discussed, *infra*, because I will decide this Motion as a motion to dismiss, I shall assume the truth of all factual allegations in the Amended Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

"As an inactive participant" in the NBE Plan, Knepper "no longer contributed" to the NBE Plan, but "his accumulated funds remained in the plan." *Id.* ¶ 19. Moreover, Knepper "began to accrue rights to benefits under the Mack/UAW Plan that were independent from any rights to benefits he had accrued" under the NBE Plan. *Id.* ¶ 17.

On or about May 1, 2000, "VGNA purchased Mack," and all Mack employees, including Knepper, became VGNA employees. *Id.* ¶ 21. According to the Amended Complaint, "in or around 2006, the NBE Plan merged into the VGNA Plan." *Id.* ¶ 22. As a result of this merger, plaintiff is "now entitled to benefits from the VGNA Plan." *Id.* ¶ 23.

On August 1, 2013, Knepper retired from VGNA, after 22 years of employment with Mack and then VGNA. *Id.* ¶ 25. He accepted an early retirement incentive bonus from VGNA, provided pursuant to a Memorandum of Understanding ("MOU") between Mack and the UAW, dated July 2, 2013. *Id.* ¶¶ 56–61.

Knepper claims that at the time of his retirement, "he was given incomplete information as to his available retirement benefits." *Id.* ¶ 26. Specifically, he contends that "Volvo representatives failed to give him a breakdown of how Volvo had calculated his benefit." *Id.* ¶ 30. According to Knepper, he was not informed of his right to take his benefits as a lump sum payment. ECF 12, ¶¶ 52, 53. He also alleges that Volvo failed to provide him with annual statements from the NBE Plan after 2003 and did not provide him with Plan documents prior to 1994, when requested. *Id.* ¶¶ 54, 55.

As a result of the allegedly inaccurate, incomplete, and contradictory information, Knepper "did not sign the paperwork that VGNA and/or Plan representatives told him he had to sign to begin receiving benefits." *Id.* ¶ 27. Knepper explains that he refused to sign due to "fear he would arguably be waiving his right to be paid the correct benefit amounts," and consequently he has

"not received the proper benefits from the VGNA Plan or the predecessor Mack/UAW Plan." *Id.* ¶ 28.

With respect to the NBE Plan, Knepper contends that defendants "failed to correctly calculate" his benefit amount. *Id.* ¶ 29. He complains that defendants calculated his benefits under the NBE Plan "by using wages prior to 1991 to determine his 'Highest Final Average Wages.'" *Id.* ¶ 32. He adds that defendants "incorrectly used" his wages from 1987 to 1991 (the years he contributed to the NBE Plan), to calculate a "monthly benefit of $148.53" with respect to the NBE Plan. *Id.* ¶ 34. But, according to plaintiff, the "Highest Final Average Wages are the five consecutive years with the highest average wage." *Id.* ¶ 33. And, he insists that defendants should have used his *overall* "highest final average wage for the five years leading up to" his retirement in 2013. *Id.* ¶ 35. In his view, based on his wages from 2005 to 2009, he is entitled to receive $249.29 per month under the NBE Plan. *Id.* ¶ 36.

Central to Knepper's complaint concerning his benefit calculation is his claim of an alleged conflict between two provisions of the 2001 NBE Plan: Section 1.26 and Section 5.7. Knepper asserts that these provisions set forth conflicting instructions as to how his benefit should have been calculated. In Knepper's view, his benefit amount should not have been determined as of 1991, when he became a union employee. Rather, his earnings after 1994 and through 2013 should have been used for averaging.

The first provision, Section 1.26, provides that the final average compensation is calculated based on income earned after 1994. *Id.* ¶ 37. It states, ECF 14-6 at 9:

> 1.26 "Final Average Compensation" shall mean a Participant's Compensation averaged over the five consecutive calendar years after 1994, out of the last 15 (or fewer) consecutive calendar years after 1994, whichever yield the highest average.

If a Participant does not have five consecutive calendar years of Compensation after 1994, his Final Average Compensation shall be based on his actual years of Compensation after 1994.

In no event shall Compensation for any Plan Year beginning before 1994 be used in determining a Participant's Final Average Compensation.

Article V of the 2001 NBE Plan is titled "Calculation Of Benefits."[2] Section 5.7 is titled Transfers." It provides, in part, ECF 14-6 at 25:

(b) *Change in Employment Status*. The following rules shall apply to a Participant whose employment status changes so that he becomes, or ceases to be, an Employee within the meaning of Section 1.22:

(1) A participant who ceases to be an Employee but continues his employment with an Employer shall have his benefit calculated on the basis of his Years of Credited Service and his Final Average Compensation as of the date on which he ceases to be an Employee.

And, under Section 1.22, "Employee" is defined as "any employee of an Employer who (a) is not covered by a collective bargaining agreement, unless the collective bargaining agreement specifically provides for participation hereunder . . . ." ECF 14-6 at 8–9.

According to plaintiff, when faced with the seemingly conflicting provisions, "Volvo has resolved the conflict between Sections 1.26 and 5.7(b)(1) by applying Section 1.26 and not applying section 5.7(b)(1) to participants that [sic] ceased to be an employee prior to 1994." *Id.* ¶ 39. In support of this contention, Knepper cites a 1997 Summary Plan Description ("SPD") that stated that "eligible earnings after January 1, 1995 will be used to determine your Final Average Earnings when calculating the amount of your benefit." *Id.* ¶ 40. Further, the SPD provided that the "Final Average Annual Plan Compensation" for use in calculating benefits would be determined by "the average of your Annual Earnings for the five consecutive plan years of the 15

---

[2] Knepper does not specify that the text comes from the 2001 NBE Plan. *See* ECF 12, ¶ 38. But, the text matches the 2001 NBE Plan submitted by defendants.

years immediately preceding your retirement date during which you receive the greatest aggregate amount of compensation." *Id.* ¶ 41.

Knepper contends that he "received benefit estimates" that calculated his benefit using his compensation after he joined the union. *Id.* ¶¶ 43, 51. In addition, he alleges that Volvo "consistently calculated the benefits of other participants using average wages at the time of retirement." *Id.* ¶ 44. This included engineering employees who were similarly situated to Knepper. *Id.* ¶ 46.

In support of his position, Knepper submitted as an exhibit to the Amended Complaint the Affidavit of Taylor Searfoss, Mack's Manager of the Pension and Savings Plan Administration for Mack from 1987 to 2009. *Id.* ¶¶ 48, 49. Searfoss avers, ECF 12-3, ¶¶ 11, 12:

> 11.     From January 1, 1994, through March 31, 2009, the period during which I have personal knowledge of the Merged Plan, pension benefits for Engineering Bargaining Unit Employees under the Contributory Option were calculated using the Plan definition of Final Average Plan Compensation, based on eligible earnings for all of the Employees' years as a Participant under the Contributory Option.

> 12.     All Engineering Employees who were similarly situated to Mr. Knepper and who retired before 2009 had their benefits under the Contributory Option calculated according to the actuary's determinations . . . and Plan administration consistent with those determinations.

Further, Knepper claims to have received letters from Volvo indicating that "his benefits would commence effective August 1, 2013." *Id.* ¶ 62. Volvo "informed" plaintiff "that he could receive his benefits retroactively to August 1, 2013." *Id.* ¶ 63. Nevertheless, Volvo "began providing benefits based on a retirement date almost three years later." *Id.* ¶ 65. Thus, Knepper claims he is owed "thirty four (34) months of retirement benefits from his Non-Contributory Pension Plan, his Contributory Pension Plan, and the UAW/Mack Plan." *Id.* ¶ 67.

In the course of discussions with Volvo, Knepper was allegedly provided with conflicting and contradictory information. *Id.* ¶ 68. Based on this inconsistent information, Knepper was

"unable to properly determine or reasonably understand the benefits and options to which he is entitled." *Id.* ¶ 69. He alleges that Volvo, once made aware of the problem, has "refused to correct, update, or in any way remedy" the conflicting information. *Id.* ¶ 70. And, Knepper alleges that even though he is receiving benefits from his UAW Plan, the amount is incorrect. *Id.* ¶¶ 72, 73. He insists that Volvo is aware of the error and has even once corrected his benefit amount, but the benefit amount is still not correct. *Id.* ¶¶ 74, 75.

Knepper pursued an internal appeal to VGNA as to both his benefit calculation under the NBE Plan and the benefits he claims he is due from the date of his early retirement to his normal retirement date. Defendants attached to their Motion a letter from VGNA, denying Knepper's claim upon review ("Denial Letter"). EC 14-7.

In relevant part, VGNA explained that Section 1.26 refers to the calculation of non-contributory benefits, and that in the revision of the 1999 NBE Plan text "all of the substantive provisions governing the Contributory Benefit were consolidated [in the 2001 NBE Plan] in a new Article XIV (see Sections 1.14, 1.15, 5.1, and Article XIV)." ECF 14-7 at 3–4. The Denial Letter also explained that Knepper could not rely on the terms of the 1997 SPD to alter the terms of the NBE Plan. *Id.* at 4.

The Denial Letter acknowledged that Knepper "received estimates reflecting calculations that took his post-transfer earnings into account," but asserted that benefit statements "do not qualify as amendments to the plan terms which ultimately determine participants' benefits." *Id.* at 5. And, VGNA claimed that Knepper's failure to return the benefits election forms placed him outside of the limited circumstances under which VGNA's "administrative practice permits . . . retroactive commencement" of benefit payments. *Id.* VGNA asserted that Knepper's "benefits may commence effective June 1, 2016, his Normal Retirement Date. Earlier commencement is

prohibited by rules established by this Committee and incorporated by reference in the plan terms." *Id.* at 6.

Knepper attached to the Amended Complaint a letter, from Edward Macey, Assistant General Counsel of the UAW, to defendants, dated October 17, 2017. ECF 12-2. Macey asked Volvo to reopen the request for retroactive benefits, claiming that "the full scope of Mr. Knepper's situation was not presented to the Board when his appeal was considered." *Id.* at 2. Moreover, Macey asserted that plaintiff was erroneously denied pension benefits from August 1, 2013, until June 1, 2016. *Id.* at 1.

This suit followed. Additional facts are included, *infra*.

## II.     Standard of Review

As noted, defendant's Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment." A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to

notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[3]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *Kolon Indus., Inc.*, 637 F.3d at 448-49. As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the

---

[3] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Knepper has not filed an Affidavit under Rule 56(d). However, in his opposition, he seeks "limited discovery." ECF 17 at 1. Moreover, he contends that "the entire record of the benefit determination" has not been submitted. *Id.* at 4. Defendants counter that not only has Knepper failed to file a Rule 56(d) affidavit, but he has failed to "specify what discovery he is entitled to, and to justify its necessity and relevance." ECF 18 at 12–13. Because pre-discovery motions for summary judgement are disfavored, I am satisfied that it is appropriate to address the Motion as one to dismiss.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts]

in favor of the plaintiff." *Kolon Indus., Inc.*, 637 F.3d at 440 (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011).  But, a court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'"  *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th

Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly

consider documents expressly incorporated by reference into the complaint. *U.S. ex rel. Oberg v.*

*Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips*

*v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Six v. Generations Federal*

*Credit Union*, 891 F.3d 508, 512 (2018); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500,

508 (4th Cir. 2015); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014);

*Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Am.*

*Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543

U.S. 979 (2004); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit

to a pleading is a part of the pleading for all purposes.").

However, "before treating the contents of an attached or incorporated document as true, the

district court should consider the nature of the document and why the plaintiff attached it." *Goines*,

822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455

(7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is

based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the

document, crediting the document over conflicting allegations in the complaint is proper." *Goines*,

822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes

other than the truthfulness of the document, it is inappropriate to treat the contents of that document

as true." *Id.*

A court may also consider documents submitted by the movant, even if they were not

attached to or expressly incorporated in a complaint. However, the document must be "integral to

the complaint" and there can be "no dispute about the document's authenticity." *Goines*, 822 F.3d

at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017),

*cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

Defendants have submitted with their Motion the NBE Plan text from 1994, 1999, and 2001, as well as Knepper's Benefit Appeal Determination and the benefit application/election forms he was sent but did not complete. ECF 14-3–6. The Plans and the Benefit Appeal Determination are integral to the Amended Complaint because they give rise to the rights Knepper is asserting against VGNA and the VGNA Plan. Accordingly, in evaluating defendants' Motion, I may consider them. However, the election forms are not integral and cannot be considered.

## III.     ERISA and the Plan

ERISA was "enacted to protect the interests of participants in employee benefit plans and their beneficiaries…." *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003); *see* 29 U.S.C. § 1001(b). It does so, *inter alia*, by setting "'various uniform standards [for employee benefit plans], including rules concerning reporting, disclosure, and fiduciary responsibility.'" *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 190 (4th Cir. 2007) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983)).

In *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004), the Supreme Court said: "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, which are intended to ensure that employee plan benefit regulation would be 'exclusively a federal concern.'" (Citations omitted). *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S.

645, 646 (1995) (explaining that "[t]he basic thrust of the pre-emption clause was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"); *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 46 (1987) (recognizing "the reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans as ERISA's crowning achievement," and noting that the legislation's sponsors "emphasized both the breadth and importance of the preemption provision" to "establish pension plan regulation as exclusively a federal concern.") (internal quotation marks and citations omitted).

Knepper specifies that the operative text comes from the 2001 NBE Plan (ECF 12, ¶ 37), but he did not include the Plan with the Amended Complaint. Defendants submitted as exhibits to their Motion the 1994, 1999, and 2001 NBE Plans. *See* ECF 14-4; ECF 14-5; ECF 14-6. The 2001 NBE Plan is the latest version of the plan attached to the Motion; it states that it is "effective as of January 1, 2001 (except as otherwise set forth herein). . ." ECF 14-6 at 5. According to VGNA, "the provisions of the Cash Balance Plan . . . incorporate the [NBE Plan's] substantive plan terms by reference." ECF 14-7 at 2.

Notably, the plan in effect when the decision to deny benefits is made is controlling. *McWilliams, Jr. v. Metropolitan Life Ins. Co.*, 173 F.3d 863, 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999) (unpublished table decision); *see Phillips v. Brink's Co.*, 632 F.Supp.2d 563, 569 n.5 (W.D.Va. July 13, 2009) (indicating that the plan in effect at the time of retirement was the operative text). Because Knepper claims it is the 2001 NBE Plan that contains the inconsistent provisions, and because the 2001 NBE Plan was the operative plan when Knepper retired in 2013, the analysis that follows is of the 2001 NBE Plan.

The text of the 2001 NBE Plan delegates discretionary authority to the Plan administrators to interpret the Plan, in accordance with its terms and the law. It states, in part, ECF 14-6 at 53:

10.2 <u>Duties and Powers of Administrator.</u>

(a) The Administrator shall have all powers necessary to administer the Plan in accordance with its terms and applicable law, and shall also have discretionary authority to determine eligibility for participation or benefits and to construe the terms of the Plan. Any construction, interpretation, or application of the Plan by the Administrator shall be final, conclusive, and binding on all persons.

(b) In addition to the duties and powers described elsewhere hereunder, the Administrator shall have the following specific duties and powers

(1) To determine questions of eligibility of Participants and the entitlement to amounts of Participants, former Participants, beneficiaries, and all other persons; . . . .

The sections of the 2001 NBE Plan that are relevant to this suit are set forth below, in pertinent part. *See* ECF 14-6 at 7, 8, 9, 21, 25, 26, 70, 71.

1.14 "<u>Contributory Accrued Benefit</u>" shall mean, for any Contributory Participant, the benefit calculated in accordance with Section 14.6. The only Participants who have Contributory Accrued Benefits are Contributory Participants.

1.15 "<u>Contributory Participant</u>" shall mean a Participant who was participating in the [Mack Contributory Pension Plan] on December 29, 1988 and who at any time before January 1, 1995 made contributions to the MCPP and/or this Plan as provided in Article XIV.

1.16 "<u>Contributory Year</u>" shall mean any Plan Year during which a Contributory Participant made contributions as provided in Article XIV.

1.22 "<u>Employee</u>" shall mean any employee of an Employer who (a) is not covered by a collective bargaining agreement, unless the collective bargaining agreement specifically provides for participation hereunder. . .

1.26 "<u>Final Average Compensation</u>" shall mean a Participant's Compensation averaged over the five consecutive calendar years after 1994, out of the last 15 (or fewer) consecutive calendar years after 1994, whichever yield the highest average.

If a Participant does not have five consecutive calendar years of Compensation after 1994, his Final Average Compensation shall be based on his actual years of Compensation after 1994.

In no event shall Compensation for any Plan Year beginning before 1994 be used in determining a Participant's Final Average Compensation.

18

5.1 <u>Normal Retirement and Benefits Formula</u>.

   (a) A Participant who is eligible for normal retirement benefits shall receive an annual pension, payable monthly, which, in the form of a single life annuity commencing on his Normal Retirement Date, is equal to the sum of his Contributory Accrued Benefit (if any) and the greater of (1) or (2)

   (1) the Participant's accrued benefit under the Plan as of December 30, 1988,

or

   (2) the sum of (A) and (B):

   (A) $360 multiplied by the Participant's Years of Credited Service as of December 31, 1988,

plus

   (B) one percent (1%) of the Participant's Final Average Compensation multiplied by his years of Credited Service earned after December 31, 1988.[4]

5.7 <u>Transfers</u>.

\* \* \*

   (b) *Change in Employment Status*. The following rules shall apply to a Participant whose employment status changes so that he becomes, or ceases to be, an Employee within the meaning of Section 1.22:

   (1) A participant who ceases to be an Employee but continues his employment with an Employer shall have his benefit calculated on the basis of his Years of Credited Service and his Final Average Compensation as of the date on which he ceases to be an Employee. . . .

14.6 <u>Contributory Accrued Benefit</u>. A Contributory Participant's Contributory Accrued Benefit is an annual pension, payable monthly, which, in the form of a single life annuity commencing on the Participant's Normal Retirement Date, is equal to the sum of his Employee-Provided Benefit and each of the following amounts:

\* \* \*

   (c) for the period beginning on January 1, 1966 and ending on December 31, 1988, the sum of (1) and (2):

---

   [4] Section 5.3(c) provides a similar formula for calculating early retirement benefits. ECF 14-6 at 22.

(1) (A) one percent (1%) of the Participant's Average Pay which is in excess of $3,000

multiplied by

  (B) the Participants number of Contributory Years in the period beginning on January 1, 1966 and ending on December 31, 1988,

 plus

(1) (A) one half of one percent (0.5%) of the Participant's Average Pay which is in excess of $6,000

multiplied by

  (B) the Participant's number of Contributory Years in the period beginning on January 1, 1966 and ending on December 31, 1988; . . .[5]

14.11 <u>Definitions</u>. . . .

 (a) <u>Average Pay</u>" shall mean:
  (1) For any Plan Year before 1995, a Contributory Participant's Pay averaged over the five consecutive Contributory Years out of the last 15years which yields the highest average. . .

## IV. The Claims

### A. ERISA § 502(a)(1)(B)

Count I of the Amended Complaint is titled "Denial of Benefits and Rights." Knepper alleges that he is entitled to recover under § 502(a)(1)(B) for defendants' "failure to provide the proper monetary amount," incorrect calculation of his "benefits payment amounts and retirement date," and failure to provide him "with all options and timing of benefits." ECF 12, ¶ 79. He asserts that he "made a proper claim for benefits and appeal as to the Contributory Plan, Non-Contributory Plan, and Mack/UAW Plan," and that "Defendants have denied [him] benefits to which he is entitled under the terms of the plans." *Id.* ¶¶ 80, 81.

---

[5] Section 14.6 continues on with calculations for other time periods. ECF 14-6 at 70.

Under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), "a plan participant may bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).

To establish a claim of wrongful denial of benefits, a plaintiff must show one of two things. *See Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 340-41 (4th Cir. 2000). "'If the plan [does] not give the employer or administrator discretionary or final authority to construe uncertain terms,'" a plaintiff must show that he is entitled to benefits based on "'the terms of the plan and other manifestations of the parties' intent.'" *Id.* (alteration in *Booth*) (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989)). Alternatively, "'[w]here discretion is conferred upon the trustee with respect to the exercise of a power,'" a plaintiff must prove that there was "'an abuse by the trustee of his discretion.'" *Booth*, 201 F.3d at 341 (quoting *Firestone*, 289 U.S. at 111).

## B. ERISA § 502(a)(3)

In Count II, titled "Breach of Fiduciary Duty," plaintiff alleges that defendants breached their fiduciary duty by "misrepresenting Plaintiff's benefits to plaintiff and failing to provide documentation as properly requested by plaintiff." ECF 12, ¶ 83. Specifically, Knepper alleges that in October 2013 and September 2016, he requested documentation for the VGNA Plan that was in effect at the time of his retirement, as well as other documents. *Id.* ¶¶ 86–88. Knepper claims he "reasonably relied on" incorrect information he was given about "the terms of the plan" and that defendants' conduct was "inequitable." *Id.* ¶¶ 84, 85. In the Amended Complaint, plaintiff seeks "equitable relief" in "the alternative," including reformation of the Plans. ECF 12

at 13.  In his Opposition, Knepper clarifies that the relief he requests under § 502(a)(3) is Plan reformation.  ECF 17 at 7–8.

Section § 502(a)(3) of ERISA, codified at 29 U.S.C. § 1132(a)(3), serves as a "catchall," offering "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy."  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).  It provides, 29 U.S.C. § 1132(a)(3):

> (a)  Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> \* \* \*
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

To establish a violation of § 502(a)(3), a plaintiff must show a violation of an ERISA provision, and that the relief sought constitutes "appropriate equitable relief."  *See Pender v. Bank of Am. Corp.*, 788 F.3d 354, 363-64 (4th Cir. 2015).  "The Supreme Court has interpreted the term 'appropriate equitable relief,' as used in Section 502(a)(3), to refer to 'those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity.'"  *Id.* at 364 (emphasis in original) (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011)) (internal citations omitted).  However, relief under § 502(a)(3) is available only if a plaintiff's relief under ERISA's other remedial provisions would otherwise be inadequate.  *See Varity Corp.*, 516 U.S. at 512; *Korotynska*, 474 F.3d at 105.

## C.  ERISA § 502(c)

Count III is titled "Violation of Section 502(c)."  Knepper alleges in Count III that on September 7, 2016, he requested "copies of the MACK-UAW Contributory Pension Plan

document from before the MACK-VGNA merger," and on October 29, 2014, he requested "the Mack Contributory Pension Plan." *Id.* ¶¶ 93, 94. But, he asserts that defendants failed to provide the Contributory Plan documents, despite plaintiff's request. *Id.* ¶ 90.

"ERISA requires [a plan] administrator 'upon written request of any participant or beneficiary, [to] furnish a copy of the latest updated summary plan description, plan description ... contract, or other instruments under which the plan is established or operated.'" *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir. 1992) (quoting 29 U.S.C. § 1024(b)(4)). Section 502(c), 29 U.S.C. § 1132(c)(1), states, in part:

> Any administrator ... (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, ... each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

## V.     Discussion

Defendants present several arguments in support of their Motion. First, they dispute the claim of ambiguity in the 2001 NBE Plan. ECF 14-2 at 17–18. And, they claim that Knepper's failure to submit the benefits election forms justifies nonpayment of benefits for 34 months, in connection with his early retirement. Therefore, defendants maintain that Knepper cannot state a claim under § 502(a)(1)(B). ECF 14 at 1.

Defendants also argue that Knepper cannot state a claim under § 502(a)(3) because the claim is time-barred; he has failed to meet the pleading standards of Fed. R. Civ. P. 9(b); the claim is preempted under the *Varity* Rule; and he has not articulated any injury or causation. *Id.* at 2.

Further, defendants argue that Knepper has failed to state a claim under § 502(c) because it is time-barred and because Knepper has not alleged any failure to produce "then-current documents." *Id.* And, defendants contend that Knepper cannot seek equitable estoppel or reformation as relief because he does not allege "reliance, fraud, relevant mistake, or resultant injury sufficient to support such relief." *Id.*

### A. Section 502(a)(1)(B)

The 2001 NBE Plan delegates discretionary authority to the Administrator. *See* § 10.2, ECF 14-6 at 53. Therefore, Knepper must make factual claims sufficient to plausibly allege that the Administrator abused its discretion in the determinations at issue in this lawsuit.

According to the Denial Letter, "all substantive provisions governing the Contributory Benefit were consolidated in a new Article XIV (see Sections 1.14, 1.15, 5.1, and Article XIV)…" ECF 14-7 at 4. Article XIV is titled "Employee Contributions." ECF 14-6 at 68.

Sections 1.14, 1.15, and 1.16 of the 2001 NBE Plan all indicate that the methods of calculating the Contributory Accrued Benefit are laid out in Article XIV of the 2001 NBE Plan. Sections 14.6 and 14.11 of Article XIV make clear that the Contributory Accrued Benefit is calculated using the Average Pay during Contributory Years, not with pay from years after a participant ceases to contribute to the plan. This part of the calculation is straightforward and unambiguous.

As to the calculation of the overall monthly benefit, Section 5.1 indicates it is calculated by adding the Contributory Accrued Benefit to some combination of other metrics that can include Final Average Compensation. It is that definition that Knepper alleges gives rise to the ambiguity.

According to VGNA, Final Average Compensation pertains to the calculation of "non-contributory benefits under the Plan," rather than the contributory benefits that were the subject of

Knepper's appeal. ECF 14-7 at 4. Final Average Compensation is referenced in both sections of the Plan that Knepper cites as conflicting: Section 1.26 and Section 5.7(b)(1). Knepper's contention is that Section 1.26 requires a calculation of the benefit amount using his wages at retirement, while Section 5.7(b)(1) requires a calculation of the benefit amount using wages at the time of his transfer to the collective bargaining unit. ECF 12, ¶¶ 37, 38. He claims that VGNA resolved this ambiguity against him, while resolving it in favor of similarly situated employees, specifically by applying Section 5.7(b)(1) as to Knepper but Section 1.26 as to others. *Id.* ¶ 39.

Defendants spend much of their Motion discussing historical revisions to the 1994 and 1999 plans, as well as other factual reasons for which Knepper's claim was denied.[6] In particular, defendants contend that Knepper's appeal of his benefits calculation was denied, not because of ambiguity but based on the construction of the 2001 NBE Plan, as informed by the 1994 and 1999 plans. ECF 14-2 at 16. The Denial Letter stated, ECF 14-7 at 3:

> The 1994 and 1999 Non-Bargaining Plan restatements consistently and unambiguously provide that, in the event of a transfer from a non-bargaining to a bargaining employment status, the compensation component in the Contributory Benefit formula is determined based on average compensation as of such transfer date and without regard to compensation earned thereafter.

---

[6] Defendants argue that the Searfoss Affidavit, attached to the Amended Complaint (ECF 12-3), fatally undermines Knepper's claim that the 2001 NBE Plan is ambiguous. ECF 13–15. According to defendants, the Searfoss Affidavit does not make reference to the 2001 NBE Plan text and instead discusses "an analogous alignment of somewhat similar plan terms" from the 1994 and 1999 plans. *Id.* at 14. This discrepancy, according to defendants, means that the Searfoss Affidavit "squarely refutes Knepper's…contrary contention that Volvo had engaged in some 'resolution' of an 'ambiguity.'" *Id.* at 17. However, at the motion to dismiss stage, the Court is evaluating the sufficiency of the complaint; Knepper has alleged an ambiguity in the text of the 2001 NBE Plan, and that is what the Court evaluates as a matter of law. The historical circumstances surrounding the calculation of benefits for people other than the plaintiff, some of which occurred before the 2001 NBE Plan existed as such, are not appropriate for consideration at this stage of the litigation.

Furthermore, the Denial Letter stated that Section 1.26 in the 2001 NBE Plan, like the "predecessor provisions in the 1994 and 1999 restatements, relates only to the calculation of non-contributory benefits under the Plan. Compensation for the purposes of determining Contributory Benefits is defined in Section 14.11(a), 'Average Pay.'" *Id.* However, Section 1.26 of the 2001 NBE Plan does not state that it refers only to non-contributory benefits. By way of comparison, the 1994 plan juxtaposes the calculation of contributory compensation and non-contributory compensation in adjacent sections (1.25 and 1.26), making it clear they are meant to be calculated differently. ECF 14-4 at 6. The 1999 plan does the same. ECF 15-5 at 7.

Regardless of the historical reasons for the 2001 NBE Plan, the legal question raised by the Amended Complaint is whether the operative text is ambiguous. General principles of contract law require that federal courts enforce "the plan's plain language in its ordinary sense." *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir.1996) (internal quotation marks and citations omitted). And, courts should determine the ordinary meaning of terms "as a reasonable person in the position of the plan participant would have understood the words." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 1995) (internal citations omitted).

Moreover, "ERISA plans, like contracts, are to be construed as a whole." *Id.* Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir.1993). And, "a court should be hesitant to depart from the written terms of a contract ... in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir.1992); *see U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100–01, 133 S.Ct. 1537, 1548 (2013) (ERISA's "statutory scheme, we

have often noted, is built around reliance on the face of written plan documents." (internal quotation marks omitted)).

If the terms of a contract are unambiguous, the Court may interpret the contract as a matter of law. *World–Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir.1992). However, in the context of a motion to dismiss, the construction of an ambiguous contract " 'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F.Supp.2d 378, 394 (D. Md. 2011) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir.1972)); *see Bliss v. National Union Fire Ins. Co. of Pittsburgh, PA*, 132 F.Supp.3d 676, 679–80 (D. Md. 2015) (noting that ordinary principles of contract law apply to ERISA and granting a motion to dismiss due to lack of ambiguity); *Perkins v. U.S. Airways, Inc.*, No. 6:14-cv-2577, 2015 WL 5783561, at *5 (D. S.C. Sept. 30, 2015) (dismissing a claim after finding no ambiguity in ERISA plan "construed as a whole"); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F.Supp.2d 728, 736 (D. Md. 2005) (holding that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

The calculation of Knepper's benefit amount "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire*, 489 U.S. at 115. In my view, the terms of the 2001 NBE Plan are not ambiguous when considered as a whole.

The Denial Letter points to Article XIV for the calculation of benefits. ECF 14-7 at 4. Section 14.11(a)'s definition of "Average Pay" explicitly states that for the plan years prior to 1995, average pay is calculated from the five highest-paid *contributory years*. ECF 14-6 at 71.

Knepper's contributory years ended when he was transferred to the bargaining position. ECF 12, ¶ 18. The 2001 NBE Plan then, construed as a whole, is not ambiguous regarding the employment years that count towards the calculation of Knepper's contributory benefit amount.

Additionally, Section 5.7(b)(1) carves out a specific circumstance for calculating non-contributory benefits. The presence of a broad instruction for calculating non-contributory benefits, Section 1.26, does not make the narrow provision, Section 5.7(b)(1), ambiguous where it applies. Sections 1.22 and 5.7(b)(1) make clear that in the special circumstance of employees who transferred to collective bargaining units, benefits should be calculated based on the years the employees actually contributed to the NBE Plan.

Nor has Knepper plausibly alleged that his non-contributory benefit was calculated improperly, other than citing the relevant sections of the 2001 NBE Plan. On the one hand, plaintiff refers to his allegedly miscalculated benefits as a "monthly benefit" (ECF 12, ¶ 34), possibly implying that there was a problem with the calculation under Section 5.1. On the other, in the same paragraph in the Amended Complaint plaintiff explicitly states that the problem is the benefit amount calculated under the "Contributory Pension Plan." It is far from clear that Knepper is even alleging anything specific about his non-contributory benefits. Knepper asserts in the Amended Complaint that he is due benefits under the "Non-Contributory Pension Plan," yet he does not define it. *See, e.g.*, *id.* ¶ 80. He makes no specific allegations that VGNA calculated this portion of his benefits incorrectly.

Furthermore, Section 5.1 directs that the monthly benefit is calculated by adding the Contributory Accrued Benefit to *either* "the Participant's accrued benefit under the Plan as of December 10, 1988" *or* the sum of two other metrics, one of which includes Final Average Compensation. ECF 14-6 at 21. Even if Knepper had plausibly stated that his non-contributory

benefits were calculated improperly, he has not argued that Final Average Compensation even factored into his calculation. In other words, even if there were an ambiguity, Knepper has not alleged that it affected him.

Knepper's invocation of the 1997 SPD is also unavailing. Summary plan documents, "important as they are, provide communication with beneficiaries *about* the plan, but . . . do not themselves constitute the *terms* of the plan for the purposes of 502(a)(1)(B)." *Amara*, 563 U.S. at 483.

Because there is no ambiguity in the 2001 NBE Plan text, Knepper has not pleaded facts sufficient to plausibly allege that VGNA abused its discretion in determining his non-contributory benefit amount under the 2001 NBE Plan.

Additionally, Knepper claims there were multiple instances on which VGNA gave him incorrect information or failed to supply information, and that defendants are "attempting to have the Court make a determination without the benefit of the full administrative record." ECF 18 at 1. As noted, Knepper appended to his suit a letter from Edward Macey, UAW's Assistant General Counsel, to Volvo, dated October 27, 2017. ECF 12-2. Relying on the document, Knepper has alleged that "the full scope" of his "situation was not presented to the Board when his appeal was considered." ECF 12-2 at 2.

The letter primarily addresses Mr. Knepper's entitlement to benefits as of August 1, 2013, despite his failure "to properly complete his application for benefits." ECF 12-2 at 2. Macey maintained that "the application process is not a legitimate reason to deny the benefits." *Id.* Further, Macey argued that Knepper's conduct did not constitute a forfeiture. However, the letter does not address or assert any claim of error in the actual calculation of benefits, other than to note

that Knepper allegedly "received numerous incorrect and/or contested pension calculations." ECF 12-2 at 3.

Moreover, Macy asserts that the Board was not told that Knepper "received an incentive retirement bonus based on an August 1, 2013 retirement date," that Knepper was "coded as retired by Mack as of August 1, 2013," or that "he had received numerous incorrect and/or contested pension calculations." *Id.* at 3. However, the Denial Letter specifically acknowledges much of this information. Indeed, there is an entire section titled "Erroneous Benefit Statement" (ECF 14-7 at 6) and a reference to Knepper's "retirement incentive bonus." *Id.*

The 2001 NBE Plan explicitly requires completion of the benefit election forms by the plan participant in order to commence benefits. Section 4.3 governs the distribution of early retirement benefits. It states, in part, ECF 14-6 at 20:

> 4.3 <u>Early Retirement.</u> A Participant shall be eligible for early retirement benefits as of his Early Retirement Date. However, a Participant who is eligible for early retirement benefits shall begin to receive payments on his Normal Retirement date unless he elects to begin receiving benefit payments earlier than his Normal Retirement Date. . . .

VGNA's procedure for the election of early retirement benefits required Knepper to return benefit election forms. In responding to plaintiff's contention that he was due benefits retroactive to August 1, 2013, the Denial Letter states that plaintiff "failed" to respond by the deadlines stated in the benefits packages. ECF 14-7 at 6. Knepper does not dispute that he did not submit the forms.

Defendants claim: "[F]ailing to receive the benefit of a special incentive-bonus retirement option, because of not properly applying for it, presents no forfeiture of a 'normal retirement benefit' upon attainment of normal retirement age." ECF 14-2 at 25. But, they maintain that it

results in "passing up a special, bonus-induced non-normal retirement . . . ." *Id.* In effect, defendants assert that plaintiff has forfeited the bonus.

Knepper's early retirement occurred pursuant to a MOU with the UAW. ECF 12, ¶ 58. The MOU is not attached to the Amended Complaint or to the Motion. Knepper also claims he is due retroactive benefits from the UAW Plan (ECF 12, ¶ 67), and the UAW Plan text is not attached to the Amended Complaint or the Motion. In addition, the Denial Letter states that "Section 6.3(C) of the Cash Balance Plan anticipates that a participant may apply for payment as of a benefit calculation date that precedes the date on which he receives a notice describing his payment election rights (i.e., the election package), subject to 'conditions adopted by the Committee.' " ECF 14-7 at 5. Neither Section 6.3(C) nor the "conditions" are attached to the Amended Complaint or the Motion. And, the Denial Letter references more information: the terms of four benefits packages given to Knepper and "rules established by the Committee and incorporated by reference in the plan terms." *Id.* at 5, 6. The issue of the precise terms of Knepper's early retirement is a fact issue that cannot be resolved at this stage of the litigation.

In any event, given the uncontradicted explanation provided by Knepper for his failure to complete the required application, equity would suggest that he is entitled to the compensation for the period in issue.

Finally, Knepper contends that "defendants failed to correctly calculate [his] monthly benefit for his UAW plan." ECF 12, ¶ 73. He claims that defendants changed the benefit amount in 2017, but that it is still incorrect. *Id.* ¶ 75. Defendants' Motion mentions this set of allegations in its factual summary (ECF 14-2 at 4), but does not appear specifically to address the allegations. As noted, the terms of the UAW Plan are not before the Court, and accordingly it would be premature to dismiss Count I as to this alleged underpayment.

## B. Relief Under § 502(a)(3)

Knepper has not stated a claim for breach of fiduciary duty. The 2001 NBE Plan is not ambiguous, and thus Knepper has not plausibly alleged that any provision of ERISA has been violated as to his benefit calculations. This is fatal to his claim under § 502(a)(3) concerning his benefit calculations under the 2001 NBE Plan.

To the extent that plaintiff has stated a claim under § 502(a)(1)(B) regarding his early retirement benefits and benefit calculation under the UAW Plan, his claim for relief in the alternative under § 502(a)(3) fails because he has not demonstrated that equitable estoppel and plan reformation are "appropriate equitable relief." Knepper seeks to reform the contract so it conforms "to the Defendants' historical practice of paying higher quantum of benefits to similarly situated participants." ECF 12 at 13. But, he has made no allegations of any "past practice" with regard to his early retirement benefits and his UAW benefit. Rather, he seeks in these instances to enforce the terms of the contract. The Amended Complaint has not stated a claim for breach of fiduciary duty on these grounds.

Knepper requests "equitable relief in the form of equitable estoppel and the reformation of the Plans to conform to the Defendants' historical practice of paying the higher quantum of benefits to similarly situated participants." ECF 12 at 13. Essentially, Knepper argues that because defendants failed to calculate the benefits of *others* according to the text of the plan, they have breached their fiduciary duty to *him*. But, as noted, defendants calculated his benefit amount according to the text of the 2001 NBE Plan. Knepper is essentially asking the Court to give him the benefit of Volvo's alleged mistake in calculating the benefits of similarly situated employees. He has not stated a claim alleging fiduciary breach as to his own benefit calculations under the 2001 NBE Plan.

32

Plaintiff also claims breach of fiduciary duty based on the allegations that defendants "misrepresent[ed] Plaintiff's benefits to Plaintiff and fail[ed] to provide documentation as properly requested by Plaintiff." ECF 12, ¶ 83. He asserts in his Opposition that he is seeking "equitable relief such as reformation" under § 502(a)(3). ECF 17 at 6. Reformation and equitable estoppel, which Knepper lists in his prayer for relief, are equitable remedies arguably available under § 502(a)(3). *See Amara*, 563 U.S. at 440–41.

As defendants point out, ECF 18 at 8–9, plaintiff does not allege that he suffered any harm as a result of defendants' alleged failure to timely provide NBE Plan documents. Knepper's failure to allege actual harm is fatal to his claim under § 502(a)(3) regarding the nonproduction of NBE Plan documents.

In *Colin v. Marconi Commerce Sys. Employees' Ret. Plan*, 335 F.Supp.2d 590 (M.D. N.C. 2004), the court discussed the applicable law in the Fourth Circuit. It said, *id.* at 605-06:

> Plaintiffs have not, however, expressly asserted any harm they have suffered as a result of Defendants' alleged failure to provide these documents. Beneficiaries cannot recover on claims under ERISA's notice provisions absent a showing that they were harmed as a result of the notice failure. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 238 (4th Cir. 1997) (affirming grant of summary judgment on the plaintiff's claim regarding defects in her notice of benefit denial, and stating that "there must be a causal connection between these defects and the final denial of a claim"); *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 30 (4th Cir. 1992) (stating that 'case law establishes that a plan participant 'must show reliance and prejudice in order to recover for an employer's failure to comply with ERISA's statutory requirements,' " and noting that even a total failure to notify will not give rise to an ERISA claim where no harm is shown) (quoting *Govoni v. Bricklayers, Masons & Plasterers Int'l Union of Am., Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir. 1984)).

What remains is a claim under § 502(a)(3) for equitable estoppel or plan reformation based on defendants' alleged misrepresentations of Knepper's benefit amounts. But, Knepper has not pleaded facts sufficient to show entitlement to these remedies.

Equitable estoppel requires a showing of reliance. "When a court exercises its authority under § 502(a)(3) to impose a remedy equivalent to estoppel, a showing of detrimental reliance must be made." *Amara*, 563 U.S. at 443. And, plan reformation requires a showing of fraud or mistake in the formation of the contract. "Equity courts, for example, would reform contracts to reflect the mutual understanding of the contracting parties where 'fraudulent suppression[s], omission[s], or insertion[s]. . . material[ly] . . . affecte[d] the substance of the contract. . ." *Id.* (internal citation omitted) (alterations in original).

On the facts alleged, equitable estoppel is not available to Knepper as a remedy. He has not asserted facts that show reliance on the incorrect benefit amounts or the 1997 SPD; rather, he has only stated in a conclusory fashion that he "reasonably relied on Defendants' misrepresentations." *Id.* ¶ 84. This cannot be considered sufficient pleading. Similarly, reformation is not available to Knepper. He has stated no facts that show fraud or mistake in contract formation.

Accordingly, I shall dismiss Count II of the Amended Complaint, without prejudice.[7]

## C. Relief under § 502(c)

Knepper alleges that he requested plan-related documents on two occasions: the first on October 29, 2014, and the second through counsel on September 7, 2016. ECF 12, ¶¶ 92–94. Knepper recounts that in response to his October 2014 email, defendants responded that "they could not provide the document to Plaintiff because they could not locate the document." *Id.* ¶ 95. Knepper also alleges that he has not received "any annual statements of the Contributory Pension Plan since 2003." ECF 12, ¶ 54.

---

[7] In view of the dismissal, I need not address the defendants' arguments regarding *Varity*, Rule 9(b) pleading standards, or the statute of limitations.

The defense contends that, as to the document requests in 2014 and 2016, the claims are barred by limitations. "Because § 1132 does not contain a statute of limitations, courts must 'borrow the state law limitations period applicable to claims most closely corresponding to the federal cause of action.'" *Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 337 (4th Cir.2009) (quoting *White v. Sun Life Assurance Co. of Can.*, 488 F.3d 240, 245 (4th Cir. 2007)).

In assessing the timeliness of a claim for failure to produce documents under 29 U.S.C. § 1132(c)(1)(B), the court said in *Corrado v. Life Investors Owners Participation Trust & Plan*, No. 08-0015, 2011 WL 886635, *11 (D. Md. Mar. 11, 2011): "Here the analogous state law limitation period is Maryland's one year statute of limitations for suits for fines, penalties, and forfeitures. Md. Code Ann., Cts & Judic. Proc § 5–107." *See also Wallace v. Freight Drivers & Helpers Local No. 557 Pension Fund*, No. 11-2062, 2012 WL 2571223 (D. Md. July 2, 2012). This limitations period applies here.

Defendants correctly note that the 2001 NBE Plan is a "defined benefit plan." That term is defined at 29 U.S.C. § 1002(35), as follows:

> The term "defined benefit plan" means a pension plan other than an individual account plan; except that a pension plan which is not an individual account plan and which provides a benefit derived from employer contributions which is based partly on the balance of the separate account of a participant…

Defined benefit plans must provide statements "at least once every 3 years to each participant with a nonforfeitable accrued benefit and who is employed by the employer maintaining the plan at the time the statement is to be furnished." *See* 29 U.S.C. § 1025(B)(i). The NBE Plan merged into the VGNA Plan in 2006. ECF 12, ¶ 22. As noted, plaintiff received a report in 2003.

Defendants contend that because of the merger of the NBE Plan into the VGNA Plan in 2006, no "discrete statements" were required for it "after the alleged 2003 statement." ECF 14-2 at 29 n.7. But, depending on the exact date of the merger, a 2006 statement may have been required.

Nevertheless, as the document requests in 2014 and 2016 and any plan statement that might have been required in 2006, Knepper filed suit long after the one-year statute of limitations for actions under § 502(c). Therefore, I shall dismiss Count III.

## IV. Conclusion

For the aforementioned reasons, defendants' Motion is granted in part and denied in part as to Count I, and granted with respect to Counts II and III.

A separate Order follows.

Date: September 27, 2019

_____/s/_____

Ellen L. Hollander
United States District Judge